Charles H. Francis, Appellant, v. David R. Joslyn, Appellee.

Gen. No. 8,947.

Opinion filed September 18, 1935. Rehearing denied October 21, 1935.

D. T. SMILEY, of Woodstock, for appellant.

DAVID R. JOSLYN, JR., of Woodstock, for appellee; HUGH A. DENEEN, of Woodstock, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court. On May 1, 1908, the parties hereto formed a partnership for the general practice of law. The written article of agreement provided that the firm name would be Joslyn and Francis and that said copartnership would commence on May 1, 1908, and continue so long as agreeable to both of the parties thereto. The agreement further provided that Francis should buy one-half of certain law books and furniture at a price specified in the agreement and that each of the parties should bear, pay and discharge equally between them

all of the rents and other expenses that might be required for the support and management of said business, and that all gains, profits and earnings that should be derived from said business would be divided between them equally. The agreement further provided that there should be had and kept at all times just and true books of account wherein should be entered and set down all money by them or either of them received or paid out in and about the said law business, and all other matters and things whatsoever to the said business and the management thereof in any ways belonging. The pertinent portion of said agreement is the following paragraph: "And Whereas, said David R. Joslyn is now a candidate for the office of State's Attorney in McHenry County, it is further agreed that in the event of his election to said office, that the fees derived therefrom shall be treated as other fees in the law business, and in the event of his said election, there shall first be paid to said David R. Joslyn from the fees of said State's Attorney's office the full amount of his campaign expenses, of which said David R. Joslyn shall keep a just and true account."

On September 8, 1911, Francis filed his bill of complaint in the circuit court of McHenry county, in which he set up the foregoing partnership agreement, and alleged that in pursuance of its terms the parties thereto engaged in the practice of law from the date of the agreement until December 15, 1909, when the partnership was dissolved. The bill further alleged that Joslyn was elected State's attorney of McHenry county in the fall of 1908 and entered upon the discharge of the duties of that office on the first Monday of December, 1908; that complainant, from the time Joslyn assumed his duties as State's attorney until the dissolution of the partnership, did all the office work connected with said office as far as it was practicable for

him to do so, and that at one term of the circuit court he made practically all the presentments before the grand jury and during the entire time the partnership continued he wrote practically all the indictments and informations and prepared all the instructions to be used in the trial of criminal cases. The bill then set forth the earnings of the firm, averred that a portion thereof was uncollected at the time of the dissolution of the partnership, and charged that the defendant had collected large sums due the partnership but had refused to account to the plaintiff for the amount due him under the partnership agreement. The bill made Joslyn a party defendant and prayed for an accounting. Subsequently, on June 8, 1917, a supplemental bill was filed. The defendant answered the original and supplemental bill and admitted the formation of the partnership but alleged that prior to December 15, 1909, he had made a full settlement with the complainant for all fees and charges due and owing the firm. In his answer he admitted the execution of the partnership agreement but averred that such an agreement was against public policy and therefore void, and denied that complainant was entitled to any relief. The cause was referred to a special master who took the evidence, and upon a hearing, the chancellor found that the partnership agreement was void, being in contravention of the public policy of this State and entered a decree dismissing the bill for want of equity. From this decree the record is brought to this court for review by appeal.

Appellant insists that the partnership agreement is legal and enforceable in all its terms; that under its provisions it became the personal obligation of appellee to place in the partnership account all the receipts of the office of State's attorney of McHenry county from the date he assumed office in 1908 until the first Monday of December, 1912, when his term of office

expired. Appellee insists that the partnership agreement is void, being against the public policy of this State. It is his further contention that while the partnership continued the earnings of the State's attorney's office were added to those of the firm and that the evidence discloses that the partnership was dissolved in July, 1909, and that subsequently and on December 23, 1909, he paid appellant $376.25, which appellant accepted in full for the amount due him under the partnership agreement.

There is no provision in our constitution nor in our statutes which throws any light upon the question of public policy in Illinois regarding contracts of this character, and no Illinois decision has been cited and we are aware of none which holds that a contract to put the salary of a public office into a partnership as part of the partnership earnings is void as against public policy nor has any decision of our own State come to our attention which holds such a contract valid. As to the precise question involved herein, we have, therefore in Illinois, no direct authority.

As illustrating the trend of judicial opinion, however, in this State, the case of *Pitsch v. Continental & Commercial Nat. Bank of Chicago,* 305 Ill. 265, is illuminating. It appeared in that case that the plaintiff was a notary public and he contracted with the defendant bank to do notarial work and accept as compensation a percentage of the fees prescribed by law. This notary and another one were given all papers requiring protest, and devoted all their time to the work, and were each to receive and did receive 12½ per cent of all protest fees received for protesting commercial paper which came into the hands of the plaintiff for protest through the defendant bank. Each half month the plaintiff gave the bank a receipt for 12½ per cent of the fees it had collected during the last one-half month and released the bank over his

signature and under seal from all claims and demands up to date, and set over and assigned to the bank all fees as notary public, due and owing to him from the bank for fees earned as a notary public during the half month preceding the date thereof. After serving the bank in that manner for a number of years and receipting each half month for the agreed percentage of his fees and releasing and assigning to the bank all he had earned as notary public during the period covered by the receipt he brought suit for such part of his earnings as he had not received from the bank, basing his right to recover on the ground that the bank was withholding money it had received for his use—and meeting the defense with the claim that the contract was void as against public policy and that the receipts and assignments executed by him in pursuance of the void contract were not binding upon him. In the course of its opinion the court said: "The proposition that a contract whereby a public officer whose compensation is fixed by statute agrees to accept for his official services something different from that provided by statute is contrary to public policy and void seems to be well supported by authority as well as justified in principle. . . . The compensation of a public official for the performance of his official duties is not a matter for traffic or trade, . . . Official morality and public policy alike prohibit the undermining of the public service by permitting officers to make merchandise of their official services."

In *Sprecher v. Christensen*, 236 Ill. App. 400, it appeared that the plaintiff was coroner and a member of the city board of health. He and the defendant were both physicians and the plaintiff sold his practice and office equipment to the defendant for $2,000, which sum the defendant paid. Their contract provided that the plaintiff would resign from the office of health officer and coroner and would recommend defendant for ap-

pointment to both of them, and in consideration thereof defendant agreed to pay the plaintiff all income received by him from the practice of medicine in excess of $4,500 for the year immediately following the date of the contract. To recover such excess plaintiff sued and the defendant set up that his promise was based on the plaintiff's promise to try to have him, the defendant, appointed coroner and member of the board of health; that the contract in that respect was against public policy and void and for that reason not enforceable. The court sustained the contention of the defendant holding that an agreement to pay a person for his aid or influence in procuring an appointment to a public office is illegal and void.

Appellant cites in support of his contention the case of *McGregor v. McGregor,* 130 Mich. 505, 90 N. W. 284. In that case the court sustained the contention of the defendant that the amount paid into the firm account by the defendant and which he had received as the salary of his office as boiler inspector of the City of Detroit was in fact a loan by him to the partnership. The court then stated that such being the contract of the parties, the agreement did not therefore amount to an assignment of an unearned salary of a public officer and was not void as against public policy. The contract, said the court, was rather an agreement as to the manner in which the salary of one of the partners as such boiler inspector should be disposed of when earned and paid. Without reference to the holding in the *McGregor* case, *supra,* the same court in *Anderson v. Branstrom,* 173 Mich. 157, also reported in 139 N. W. 40 and in 43 L. R. A. (N. S.) 422, held that the contract there involved did amount to an assignment of an unearned emolument of a public office. In the *Anderson* case it appeared that the parties thereto were lawyers and on February 10, 1911, entered into a partnership agreement which among

other things provided that Branstrom, who was prosecuting attorney for Newaygo county, should bring his salary as such prosecuting attorney into the partnership and divide the same equally between the partners. In its opinion the court stated that the salary is the *quid pro quo* paid by the public for the performance of public official duties, that the agreement there under consideration in substance and effect assigns, before it is earned, this salary and that the contract was therefore void. The opinion then continues: ''The test of the validity of such an agreement is not, I think, whether, if it was faithfully carried out, the public would be harmed, but its validity must be measured by its tendency. It is undoubtedly true that the salary of public office is frequently brought into firm account and divided by the officer with partners. But assignments of unearned emoluments of public office are not favored, and courts have, pretty uniformly, refused to enforce them. The agreement in question amounts to such an assignment, and it would seem therefore that the courts should refuse to enforce the agreement, directly or indirectly. We said in *Granger v. French,* 152 Mich. 356, 116 N. W. 181, 125 Am. St. Rep. 416, that 'the rule of public policy makes all anticipatory assignments of salary by the relator void, and demands that he be paid his official salary notwithstanding such assignments.' This rule was restated and affirmed in *Dunkley v. Marquette,* 157 Mich. 339, 122 N. W. 126, 17 Ann. Cas. 523. See also *Bailey v. Sibley Quarry Co.,* 166 Mich. 321, 129 N. W. 17; Mechem, Public Offices and Officers, sec. 370; *Benson v. Bawden,* 149 Mich. 584, 113 N. W. 20, 13 L. R. A. (N. S.) 721.''

In *Gaston v. Drake,* 14 Nev. 175, it appeared from the complaint that the parties to that litigation had formed a copartnership to practice law in Story county, Nevada; that while they were partners, both being of the opinion that if the defendant was elected to the

office of district attorney of that county that their business would be greatly increased, mutually agreed that the defendant should run for such office and if elected that then the plaintiff was to aid the defendant in the business of the office, for which services he was to receive one-half of the fees. In holding this contract void as against public policy, the court said that the tendency of such a contract was to induce the plaintiff to use all of his influence for defendant's election, even though he did not agree to do so; that such an arrangement might have induced him to influence 10 men or 100 men to vote for the defendant in opposition to preconceived political principles and fixed ideas of right and duty; and, too, when they may have preferred his opponent as an incumbent of the office. "Such a contract cannot be upheld," said the court in its opinion. "Its tendency was to corrupt the people upon whose integrity and intelligence the safety of the State and Nation depends—to lead voters to work for individual interests rather than the public welfare. In my opinion, in the majority of cases, men will work as industriously, under a contract that they shall assist in performing the labors, and share in the profits, of an office, if another is elected, as they would if a promise to use all their influence should be subjoined. With most men self-interest is among the strongest incentives to effort and it requires no added promise to act as a stimulating influence. . . . If there are any contracts upon which courts should 'put the stamp of their disapprobation,' it is those curtailing or tending to curtail a free exercise of the elective franchise."

In *Wishek v. Hammond*, 10 N. D. 72, also reported in 84 N. W. 587, an agreement by partners that they should secure the appointment of one of them as a court commissioner and that his fees as such court commissioner should become partnership assets was held to be void as against public policy.

In *Deyoe v. Woodworth,* 144 N. Y. 448, it was held that an agreement between the sheriff and his deputy by the terms of which the deputy agreed to pay over to the sheriff one-third of all fees collected by him, which under the law were payable directly to the deputy, was void as against public policy.

In *Robertson v. Robinson,* 65 Ala. 610, it appeared that Robertson entered into an agreement with Sewell, who was a candidate for tax assessor, by the provisions of which Sewell agreed that if he was elected he would appoint Robertson his chief deputy and pay him from the fees of the office $2,500, providing Robertson should make for him his official bond and perform certain duties of the office. In holding the agreement void, the court said: ''Of such an agreement, in the strong language of Chief-Justice Wilmot, in *Collins v. Blantern,* 2 Wils. 341 (1 Smith's L. C. Pt. 2, 673), it may be said, that it 'is void *ab initio,* by the common law, by the civil law, moral law, and all laws whatever.' It concerns a place of public trust, in which the public have high interests, involving the performance of public duties, and which cannot be made the subject of traffic, and cannot become the matter of trade and bargaining. It was corrupting the appellant as a voter, bound by his duty to cast his vote from public, not private considerations, on the eve of the election to make such a proposition; tempting him to merge his duty as a citizen in the promptings of mere selfishness, in the gratification of his avarice. It was bargaining away the discretion in the appointment of a deputy, which Sewell was bound to exercise for the public good, and not for the promotion of his private interests or convenience. It was an irrevocable appointment, continuing during the term of office, which was contemplated, fettering the power of appointment with which Sewell was clothed by law. In fact, it was a sale of the office of deputy, and the consideration was not only the services the appellant was expected to render, but the mak-

ing of the official bond. The people of Montgomery county, trusting to the integrity and good judgment of Sewell, elected him to the office of assessor of taxes. Their confidence was repaid by his transfer to the appellant of every duty not merely ministerial, attaching to the office, in consideration really of ease and convenience in making the official bond. It would be far better that public trusts, public offices, or the deputations to them, should be exposed at public auction to the highest, or to the lowest bidder, than that they should become the subject of such private bargaining and traffic. . . . No judicial tribunal, so far as we can discover, has ever given countenance to any such agreement; and if popular elections are to be kept free from the taint of selfishness and corruption—if public offices are to be dignified as public trusts, and the performance of official duty preserved from the contamination of unlawful and improper influences, all such agreements will be condemned.''

In 13 C. J. 439, the author of the article on Contracts says: ''An agreement by a member of a partnership, on his being elected to a public office, to pay into partnership funds all salaries and commissions derived from the office is against public policy.'' In support of the text, the case of Santleben v. Froboese, 17 Tex. Civ. App. 626, 43 S. W. 571, is cited. In that case it appeared that there was an agreement whereby one of the partners on being elected county treasurer should pay into the firm's hands, all salaries and commissions derived from his office. In holding the agreement unenforceable, the court said: ''The idea that an officer elected by the people can put his office in as part of the assets of a partnership is utterly repugnant to public policy and the courts will utterly refuse to enforce any such contract.'' The author of the article in Corpus Juris also cites the case of Thurston v. Fairman, 9 Hun 584, as holding to the contrary. We have examined that case and in our opinion the conclusion

there reached is out of harmony with the rule which obtains in other jurisdictions and also in later New York cases.

In *Campbell v. Offutt,* 151 Ky. 229, it appeared that defendant Offutt executed two notes, one for $200 and another for $66.66, both payable to the order of Campbell and Young, attorneys. At the same time the $200 note was executed, the parties entered into an agreement whereby Offutt agreed to employ the payees as his attorneys when appointed State revenue agent, they to do the legal work connected with the office and to accept as payment in full for their services an amount equal to one-half of the income of said revenue agent. The notes not being paid, suit was instituted thereon and in affirming a judgment for the defendant, the court said: "Such an agreement is contrary to public policy and is void. If Offutt had secured the office and had refused to employ Campbell and Young as his attorneys to attend to the business of the office and they had sued him upon this contract, no court would have enforced it, or given damages for its breach. The law requires of a public officer that he shall use his best skill and judgment for the protection of the public interest, and an agreement before his appointment to divide the fees of the office with an attorney, if sustained, might seriously cripple the public service; for in this event the public would secure the services of an attorney in some instances who would offer the best terms to the official to secure the employment. . . . The agreement being one which the law will not tolerate, cannot be enforced. The consideration of the transaction is the illegal agreement and as the notes rest upon an illegal transaction, they cannot be enforced."

In the *Anderson* case, *supra,* the contract which the court held void is set forth in the dissenting opinion. The substance of the provision in that contract and the substance of the provisions of the contract here under

consideration is the same. The tendency of this provision in the instant contract would be that the appellant would use all his influence to bring about appellee's election to the office of State's attorney. The contract provides that if elected appellee should bring to the partnership all the fees derived from such public office and these fees were to be treated as other fees and divided equally between the parties hereto. In our opinion this provision under the foregoing authorities is not only void but is so connected with the other provisions of the partnership agreement that upon no rational basis can it be said that the contract is divisible. The decree of the circuit court is therefore affirmed.

*Decree affirmed.*